## TRUAX v. ESTES.

### (Circuit Court, D. Oregon. March 15, 1899.)

### No. 2,395.

**1. DAMAGES—BREACH OF CONTRACT—RULE IN EQUITY.**
A court of equity, in a suit brought to reform a contract for the pur-
chase of cattle, which were not to be delivered for several months after
the date of the contract, and to recover damages for its breach, will not
enforce the strict rule of law, which permits a party to disregard notice
that a contract will not be performed, and to wait until the time for per-
formance, and recover damages as of that date, where the plaintiff was
notified within a week from the making of the contract, and before he
had suffered any damage, by defendant, that it would be impossible to
furnish the cattle at the prices named, of which fact the plaintiff was
aware when the contract was made, but the defendant was not.

**2. CONTRACT—ENFORCEMENT IN EQUITY—FRAUD IN PROCUREMENT.**
Defendant signed and delivered to plaintiff's assignor a memorandum
prepared by the latter, by which defendant proposed to furnish cattle,—the
number, price, and date of delivery being stated therein; the option to
be accepted within 30 days. Defendant testified that the agreement was
that the writing was to be merely a memorandum, to serve as a basis
for a future contract; that he was to have 30 days to ascertain whether
he could furnish the cattle, and the other party, who was a freight agent
for a railroad, and interested only in procuring the shipment of the cattle
over his road, to ascertain whether he could dispose of them; that
defendant, owing to his defective sight, could read the writing but im-
perfectly, but, seeing that it provided for 30 days, thought it in accord-
ance with the agreement, and signed it. The other party had in fact
previously made an arrangement to dispose of the cattle to plaintiff, and
telegraphed his acceptance the following day, following this by a letter
stating that he would be there within 30 days "to make the contract
as per our understanding." Defendant replied that he had been through
the country, and found the stock could not be bought at the price named.
It further appeared that both parties knew at the time the memorandum
was signed that it was doubtful whether the cattle could be so bought.
*Held*, that the evidence sustained defendant's contention, and that in a
suit in equity brought by plaintiff to reform the writing as to the number
of cattle therein sold, and to recover damages for breach of contract, the
writing would not be enforced against the defendant as a completed con-
tract according to its terms.

This was a suit in equity by Daniel W. Truax against Hardin W.
Estes to reform a written contract, and to recover damages for its
breach.

A. L. Veazie and Zera Snow, for plaintiff.
John L. Rand and L. R. Webster, for defendant.

BELLINGER, District Judge. This is a suit to reform a written
contract for the sale of cattle, and for damages for a violation of the
contract. The contract consists of a written offer to one Langley
by Estes, and acceptance by the former, who afterwards assigned the
contract to the plaintiff. The writing is as follows:

"Baker City, Oct. 23, 1896.

"I, H. W. Estes, agree to furnish B. H. Langley or order five hundred
yearlings and five two year old steers, delivered in Baker City stock yards
June 1st, 1897, at $10.00 and $15.00, respectively. All to be A-1 stock. No
Jerseys or Holsteins or lame or diseased animals. Cash on delivery. This
agreement to be accepted in thirty days.                H. W. Estes."

92 F.—34

It appears that it was the intention of this option to provide for the delivery of 500 two year old steers, instead of 5, as written. The plaintiff claims that he has been damaged, by defendant's failure to deliver the steers contracted for according to this writing, in the sum of $7,000. The defendant admits signing the memorandum referred to, but alleges that this was a mere memorandum, to serve as a basis for a contract, if defendant should find that the cattle named could be purchased, and if Langley should succeed in negotiating a sale of them to some third person; "that it was never intended, either by Langley or by the defendant, that said writing should be obligatory upon either of them, and, on the contrary, it was agreed and understood that said writing should not be of any force or effect whatever until and unless within thirty days thereafter it was voluntarily accepted by both parties, and that in no event and under no circumstances was said writing itself to be or become a contract for the sale of said cattle, or to be or become operative between them for that purpose." The facts attending this memorandum of agreement are as follows:

Langley is a railroad man,—a freight solicitor for the Great Northern Railway. According to his testimony, his purpose in what was done was to secure freight shipments over the road which he represented. Prior to this contract he had had some business, or business correspondence, with Estes. He met Estes at the Hotel Washauer, in Baker City. There was present with the latter a man named Wickersham, who lived with Estes, and who carries on the business of a butcher. Langley testifies that he had some conversation with Estes and Wickersham at the hotel:

"Q. What was the result of that? Was any agreement reached there? A. No, sir. Q. What did you say and do then with reference to leaving or breaking off from all conference with them? A. Mr. Wickersham had some conversation and talk in regard to it, and I remarked that I would have nothing to do with him in any way whatever, and got up and left. Q. You got up and left? A. Yes, sir. Q. What did you do then? A. I went to the station. Mr. Estes went with me. Q. At whose instance or solicitation did Mr. Estes go with you to the station? A. Well, I don't know whether I suggested that he ride down to the station with me, or not."

Upon arriving at the depot the agreement was signed by Estes. Wickersham testifies that in the conversation at the hotel between Langley, Estes, and himself, he told Langley, in Estes' presence and hearing, that the cattle could not be bought for the prices Langley proposed to pay (being the prices named in the agreement signed by Estes at the depot); that thereupon Langley got up and said, "I will not have anything more to do with you. I will do my business, or talking, with Mr. Estes;" that Estes started to go home with witness, when Langley called him back, whereupon Langley and Estes got into the hotel bus together. Estes testifies that he met Langley on the train as he was returning from Lagrande to Baker City; that Langley requested Estes to meet him at the hotel in Baker City; that upon his return home he went to the hotel, taking Wickersham, whom he had requested to go with him. There had been some negotiations, but without reaching an agreement, between the parties, prior to this time, with reference to the purchase of calves. Estes, testifying as to

the transaction which led up to the signing of the option in question, says that Langley wanted 500 head of yearlings and 500 head of two year olds by the 1st of June, 1897. Estes answered:

"And I told him I didn't want that kind of a contract. I told him that we had hard winters, and them two classes of cattle was hard to buy on the range, and I didn't care about that kind of a contract."

He further says that, as the bus drove up to the hotel for the train (it being train time), he and Mr. Wickersham came out of the hotel, and started towards home; that Langley asked him if he would not get in the bus, and go with him down to the depot, which the witness did; that after arriving at the depot they walked down to the platform, and Langley proposed that he would give Estes 30 days to look over the range, to see whether these cattle could be bought at the prices named, stating that he wanted 30 days to look around and see whether they could be sold, providing it was all right with Estes; that while he (Estes) was waiting for the train, and was standing by the door of the telegraph office at the depot, Langley came up to him, and laid a couple of papers on the table, and asked him whether he would sign them or not. Estes says:

"I picked them up, and I looked at them, but I didn't have my glasses along with me, and I could not see it very well; but I could see enough, by holding the papers up to the light, that there was thirty days down on the paper, and five hundred head of cattle,—I could see that,—and I thought the days was all right; and then I signed one of the papers, but I ain't positive whether I signed both of them. I might have signed both of them, but I don't recollect of signing but one. Q. Well, was there anything said about the entering into a contract at any time,—about when it should be done? A. Well, if it was agreeable, and I could deliver the cattle, why, then, we would close the contract. He said he would come down at the end of thirty days, and we would fix it up."

Estes, according to his testimony, understood that the arrangement left it open to both parties to determine at the end of the 30 days whether a contract for these cattle would be entered into between them; that he (Estes) was to have this 30 days in which to make inquiries, and ascertain if the cattle could be bought, and that Langley was to have the same time to ascertain if he could dispose of the cattle as he was desirous of doing. Langley, in rebuttal, testifies that after the paper, which was executed in duplicate, was given to Estes, he put it in his pocket; that Langley put his copy in his own pocket, and they went out on the platform, and were talking over different things; that at last Estes said to the witness, "I will give you $50, if you will let me off on this option;" that he (Langley) answered, "What kind of a man do you think I am? I won't let you off for $500. I am securing these cattle for other parties."

This is the substance of all the testimony touching the signing of the option referred to, and the circumstances leading up to it. The option, as already appears, was signed on the 23d day of October, and by its terms Langley was to have 30 days in which to signify his acceptance. On the 24th of October, Langley telegraphed Estes, at Baker City, as follows:

"Will accept offer for the five hundred yearling steers and five hundred two year old steers, delivered June first next at prices agreed upon. Will be there soon as possible to execute contract within thirty days sure."

Two days later, and on October 26th, Langley wrote the following letter to Estes:

"Confirming my message of 24th regarding the purchase of the five hundred head of yearling steers and five hundred head of two year old steers, delivered at the Baker City stock yards on the first of June, 1897, at ten dollars ($10.00) per head for the yearlings and fifteen dollars ($15.00) per head for the two year olds, as per agreement. I will be there to make the contract as soon as possible, at least within thirty days, as per our understanding, you can go right along and secure the stock. Hoping to see you soon, I am,
            "Yours truly,                                  B. H. Langley."

To this letter, Estes, under date of October 29, 1896, answered as follows:

"Your favor of the 26th received. In regard to the purchasing of those five hundred head of yearlings and five hundred twos, will say that it will be impossible for us to get them. We have already looked over three counties, and find that that class of stuff is scarce, and hard to buy. I am now going further west and south, to see what I can do in that country. Will let you know soon whether we can do any business or not."

And again, on the 7th of November following, Estes forwarded to Langley the following letter:

"Yours of Oct. 26 at hand, and in reply will say that I do not believe the class of stock that you desire can be secured in this country. I have seen a number of the prominent stockmen of this and Malheur counties, and they are not disposed to sell that class of cattle. Inclosed you will find a letter from the man that I sent to Grant Co., which indicates that the same condition prevails over there. Taking everything into consideration, I would not care to take a contract to furnish you with 1,000 head of that class of cattle."

This correspondence was followed by a visit by Langley and Truax, to whom Langley had on November 2, 1896, assigned the option in question. Langley says that on the occasion of this visit he introduced Truax to Estes as the gentleman to whom he had assigned the agreement for the purchase of the cattle; that Mr. Estes remarked that he could not furnish the cattle. Langley then said to Estes, "This is a very curious thing," and inquired of Truax if he had the contract. The latter said he had, and took it out of his pocket. Langley held the agreement up to Mr. Estes, and said: "Do you recognize this paper?" The latter said: "Yes, sir. That is your signature? Yes, sir. Mr. Estes, when you signed that paper, did you sign it in good faith? Yes, sir. When you signed that, didn't you intend to furnish the cattle? Yes, sir; but I can't do it." Truax gives substantially the same version of what took place on this occasion. Estes says that he was excited, and hardly recollects what he did say; that he did say he thought the signature on the writing was his; and that he did not state that he considered himself bound by the writing, or that he intended to deliver the cattle on its account. Langley further testifies that while at Baker City he consulted an attorney, and, as a result of the advice he received, he (Langley) went to the bank, and got $500, to be used as a payment to Estes upon the option in question; that he did this simply because the attorney consulted told him it was necessary; that he did not tell the attorney that his understanding was that he was to pay Mr. Estes this amount, but that he did tell him' that, in the previous conversation in regard to this matter, he (Langley) had suggested to Estes that, if a formal

contract was made, he might ask $500 to bind the bargain. Langley's testimony as to this payment proceeds as follows:

"I had suggested at the time, if a formal contract was necessary, that they might suggest paying $500. Q. Who might suggest paying $500? A. I suggested it. Q. Now, Mr. Langley, if this contract contained all of the agreement, and was the contract, why did you go to Baker City in order to tender to Mr. Estes, or make arrangements to tender to him, $500, if it was not necessary for you to do it? Mr. Snow: I object to that. That is assuming a fact that is not proven in the case. Court: I understand the witness to say that, in conversation which he had at the hotel, it was understood that Mr. Estes might demand $500 upon the execution of a formal contract. That is the statement you make? A. Yes, sir; that was our talk at the hotel."

The conduct of Langley and Truax in providing $500 to be paid Estes; the statement in Langley's telegram and letter of acceptance of the option of October 23d and 26th, respectively, "Will be there soon as possible to execute contract, within thirty days sure," and "I will be there to make the contract as soon as possible, at least within the thirty days, as per our understanding, you can go right along and secure the stock,"—are inexplicable, upon plaintiff's contention as to the facts in the case. If the option and its acceptance were to constitute a contract between the parties according to its terms, no tender of money was necessary, nor was it necessary that a contract should be made "within the thirty days." According to Langley, the 30 days was merely the limit of his option to accept the terms of the writing which he had prepared and Estes had signed; but Langley had made haste to telegraph his acceptance the next day after the option had been signed by Estes, and confirmed his acceptance by a letter two days later: "I will be there to make the contract," "at least within the thirty days, as per our understanding." This reference to an understanding which included the making of a contract within 30 days from the date of the so-called option is not explained by Langley, and it admits of no explanation consistent with his testimony. It is consistent with Estes' statement, to the effect that there was an understanding by which Estes was to have 30 days to "look over the range," and see whether the cattle in question could be bought at the prices named, and Langley would in the meantime ascertain whether he could dispose of them; the latter having, according to his own statement, no other interest to serve than that of controlling the shipment of the cattle over the line of road for which he was soliciting freight; and he had prior to this time been conferring with buyers of cattle, without, as he states, having reached a definite conclusion, to ascertain how and in what way he could place these cattle, should he make a contract for them. Under these circumstances, nothing could be more natural than such an understanding as Estes testifies was had. To bind himself irrevocably then, without knowing whether the cattle could be had, would have been an act of incredible folly on Estes' part. Langley testifies that Estes said he already had half the cattle required, but Estes denies this, and Wickersham's statement at the hotel to Langley that the cattle could not be bought for those prices tends to corroborate Estes. In any event, a large part of these cattle would have to be bought on the range, and, if Estes had not already appreciated the uncertainty of getting them,

Wickersham's statement would have warned him. Wickersham and Estes lived together, and their relations were probably intimate. Wickersham accompanied Estes, at the latter's request, to the hotel to meet Langley. This goes to show that Estes relied upon Wickersham's judgment and advice, and, in view of Wickersham's opinion, expressed to Langley in Estes' presence, that the cattle could not be bought for the prices named, renders it all the more improbable that Estes should have intended to commit himself, as claimed by Langley. Moreover, the acts of the parties immediately following the understanding point to the truth of the matter. Estes, according to his letter of October 29th to Langley, had "already looked over three counties," and found "that class of stuff scarce and hard to buy," and he said, "It will be impossible to get the cattle." Now, while he might have conducted this energetic search to find cattle which he had already agreed to furnish, it is apparent from this that, at the time the option was signed, Estes did not have the cattle to furnish under his offer, and he knew that he had no assurance of getting them. The only answer to this letter was the appearance of Langley and Truax at Baker City on the 9th or 10th of November, where they consulted a lawyer, who advised them that it was "necessary" to make Estes a tender of $500. This advice, to have been warranted, must have resulted from some representation of facts different from those relied upon on the hearing. Estes testified that, when they were "talking about the thirty days," he told Langley "that if there should be a contract effected on these cattle, if they could be bought for those figures," he (Langley) "would have to pay some money down on them." And in another part of his testimony he says that when they were talking about the cattle he told Langley that there would have to be $500 put up any way. Langley's explanation as to this tender is that he told his attorney that in a previous conversation in regard to this matter he (Langley) had "suggested that, if a formal contract was made," he (Estes) might ask "$500 to bind the bargain." This explanation is worse than none. There is only one reasonable explanation of this tender or proposed tender of $500, made under the advice of counsel, "to bind the bargain," and that is that the written option did not contain the understanding between the parties; and the conclusion is irresistible that the truth is, as Estes states, that by their understanding it was left open to the parties to enter into a contract in the future, and in the event of such a contract one of its conditions would be an advance payment of $500 to Estes. I am satisfied that Estes was imposed upon in signing the option of October 23d. His own testimony as to this is corroborated by the circumstances attending the transaction. When, at the hotel, Wickersham said that the cattle could not be had at the figures named, Langley refused to continue the conversation in Wickersham's presence. The parties left the hotel together. Estes started to go home with Wickersham, when Langley called to him; and at the latter's request Estes got into the hotel bus, and the two rode to the depot together. Wickersham and Estes both testify to this effect, while Langley says he cannot recollect whether he asked Estes to go with him or not. It is apparent that Langley wanted to get Estes where he would be

without Wickersham's advice and influence. There is something sinister in this maneuver by which Estes was separated from Wickersham, and was induced to sign the memorandum hurriedly prepared at the depot by Langley,—a writing which, not having his glasses, Estes could only read imperfectly, and which Langley at the time, according to his testimony, considered so favorable to him that he told Estes, who had already repented his action, and offered $50 to be released, that he would not let him off for $500. Truax, the plaintiff, testifies that he had arranged with Langley to take these cattle before the option was signed. What took place between them after the option was signed is explained in Truax's testimony, as follows:

"Q. And at the time he talked with you first, the option in this case had not been taken at all? A. I think not. Q. Now, when was it that he came back and said he had an option? A. Well, I don't know that I can give you the date, but it was the very last of October, when he was going through East. Q. He was going through, and he met you, and says, 'I have got an option'? A. Yes. sir. Q. Did he show it to you? A. No, sir; not then. Q. When did you first see it? A. I didn't see it until on his return. He told me then he would have it properly assigned over to me when he came back, and when he came back he delivered it to me at the depot."

Truax paid nothing to Langley. There was no understanding or agreement or payment between them after Langley obtained the option. Langley, in passing through Tekoa, where Truax lived, on his way East, saw the latter at the depot, and told him he had an option. On Langley's return he again saw Truax at the same depot, as the train was passing through, and delivered the option, properly assigned. This assignment is dated at Helena, Mont., November 2d; and so it must have been made while Langley was at that place during his trip East. This shows that the 30 days reserved to Langley in which to accept the option was to serve some other purpose than the one pretended. The real purpose of this 30-days option was to deceive Estes into believing that each of the parties had 30 days in which to decide with reference to a contract; that he had this time to hunt the ranges, and see if the cattle could be had at the prices offered, and Langley the same time to ascertain whether he could dispose of the cattle, if they were to be had. These unfavorable impressions are confirmed by a comparison of the two men as they appeared on the witness stand. Making due allowance for the change that two years may have made in Estes' health, he still could have been no match for Langley. It was the case of a man advanced in years, broken and infirm, with impaired sight, slow to think, easily dominated by a stronger will, in the hands of a man of whom it is enough to say that his appearance and manner justify his selection by a great railroad to compete for business with its rivals. I am satisfied that Estes was deceived by Langley into signing the option, and that Langley's purpose was to keep this writing in reserve for use if Estes should decline to execute a contract for the sale of the cattle wanted by Langley within the 30 days agreed upon. There is no other explanation of Langley's conduct in writing Estes after the option was signed, and after he had telegraphed his acceptance, that he would be in Baker City "within the thirty days" "to make the contract," "as per our understanding," and in providing for a tender of $500,

after taking the advice of an attorney that this would be "necessary to bind the bargain."

Plaintiff contends that, under the pleadings and evidence, there is no room for any claim of fraud or undue influence. It is true that this defense is not made in terms. The answer admits the execution of the writing, and alleges, in effect, that it does not set out the understanding of the parties, and it shows this by stating what that understanding in fact was; and Estes' testimony supports these allegations. From his testimony it appears that the understanding had between himself and Langley was different from that embodied in the writing, and it shows, furthermore, that Estes was, at the time he signed the writing, ignorant as to its terms. He says that he didn't read the writing "all over"; that he has only one eye, and cannot see well out of that; that he was without his glasses when he signed the option, and could not see it very well; that, by holding the writing up to the light before signing it, he could see "that there was thirty days down on the paper, and five hundred head of cattle," and, thinking "the days was all right," he signed the paper; that if he could have read it "all over, and got the whole sense of it," he never would have signed it, because it was not the agreement. The effect of this is that Estes believed the writing embodied the understanding that both parties had 30 days to decide as to an engagement to sell and purchase cattle. He had no occasion to be particular as to the other provisions of the instrument, so long as it was open to him for this period to go on with the deal or not, as he might determine, within the prescribed time. I am of the opinion that the allegations in the answer are sufficient to admit this proof, and that it is not necessary that the defendant shall allege in terms that he was deceived as to the terms of the writing; that it suffices if he alleges, and shows by the facts set out, that the writing does not contain the understanding of the parties. I do not think it a fair inference from the allegations of the answer that the parties intended that the language of the option should have a meaning different from its import, or, in other words, that the defendant understood the terms of the instrument, but relied upon a contemporaneous verbal understanding to control their meaning. I am not free from doubt as to this, and, if the question had been raised upon exception to the answer, the intendment against this pleading would have been stronger than it is now, after the evidence has been gone into and a final hearing had.

Aside from these considerations, and upon the facts as claimed by plaintiff, his demand is unconscionable. At the time when Estes notified Langley that it would be impossible to furnish the cattle, six days after the signing of the option, Langley had suffered no damages. At this time there was a breach without damage, so far as appears. It is immaterial that at law Langley or his assignee might, notwithstanding this breach, wait until the time for performance arrived, and recover their damages then accrued. The plaintiff has seen fit to go into a court of equity, where the harsh rules of the law are not enforced. What is prayed for here is in character a penalty, —a judgment in equity for $7,000, because there is that much difference between what plaintiff claims he was to pay for the cattle

in question and the price at which these cattle could have been sold at the date specified for delivery, without reference to their price on the day of the alleged contract, or of its breach a week later. What testimony there is on that point shows that the cattle could not be bought at the time of the alleged contract for the prices specified, and that Langley and Truax were advised of this. They did not, therefore, lose an opportunity to purchase at these prices in reliance on the alleged agreement. They parted with nothing, lost nothing, and were in no wise affected, by the alleged promise of Estes; for they were advised immediately of the impossibility of supplying these cattle, if they did not know of it at the time, as I am convinced Langley did. The case is not within the rule which permits a party, when there has been a breach of contract, to disregard a notice from the other party of his repudiation of the contract, and recover damages as of the date fixed for performance. The reason for that rule is that the other party is not permitted to choose his own time to discharge himself from liability, and moreover he may reconsider his determination to repudiate. This is a case where the contract is impossible of performance, and was so when it was made, and Langley knew it. If Langley's statement is true,—that Estes, immediately after he had signed the option, regretted his act, and offered $50 to be released, and that Langley said in reply to this request that he would not release him for $500,—it tends strongly to show that Langley believed that he had overreached Estes. In morals, if not in law, the effect of Estes' request was to rescind the option,—a thing he had a right to do, in any view of the case, as long as Langley did not accept it. This conduct on Langley's part places him in a most unfavorable light. Estes says nothing of the kind occurred, and, if this is true, then Langley has willfully stated an untruth in order to make it appear, from Estes' alleged anxiety to be released, that he understood the terms of the option at the time he signed it. If Estes was deceived in signing the option, or if, signing it with knowledge, he immediately signified his anxiety to be released, at a time when, Langley not having accepted, it was his right to withdraw, but through ignorance of his right he omitted the necessary formality to effect such withdrawal, in either event the demand of the plaintiff is inequitable, and must be denied.